# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EAGLE FORCE HOLDINGS, LLC, and EF INVESTMENTS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 10803-VCMR |
| STANLEY V. CAMPBELL, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: January 25, 2019
Date Decided: August 29, 2019

Frank E. Noyes, II, OFFIT KURMAN, P.A., Wilmington, Delaware; Harold M. Walter and Angela D. Pallozzi, OFFIT KURMAN, P.A., Baltimore, Maryland; *Attorneys for Plaintiffs*.

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware, *Attorney for Defendant*.

**MONTGOMERY-REEVES, Vice Chancellor.**

In 2013, Richard Kay and Stanley Campbell decided to form a business venture to market medical diagnosis and prescription technology that Campbell had developed. The parties outlined the principal terms of the investment through two letter agreements in November 2013 and April 2014. Under the principal terms, Kay and Campbell would form a new limited liability company and each would be a fifty-percent member. Campbell would contribute the stock of EagleForce Associates, Inc. ("EagleForce Associates"), a Virginia corporation, and the membership interest of EagleForce Health, LLC ("EagleForce Health," together with EagleForce Associates, "EagleForce"), a Virginia limited liability company, along with intellectual property. Kay would contribute cash. For many months after April 2014, the parties negotiated several key terms of the transaction documents for the new venture. In the meantime, Kay contributed cash to EagleForce Associates. Campbell executed a promissory note for these contributions with the agreement that Kay would cancel the note when they closed the deal on the new venture.

On August 28, 2014, Kay and Campbell signed the transaction documents, which included an operating agreement for Eagle Force Holdings, LLC ("Eagle Force Holdings"), a Delaware limited liability company, and a contribution agreement. The parties dispute what occurred at the August 28 meeting. Plaintiffs assert that the parties formed binding contracts at the August 28 meeting. Campbell

1

contends that he signed to acknowledge receipt of the latest drafts of the agreements but not to manifest his intent to be bound by the agreements.

In this opinion, I hold that Campbell's conduct and communications with Kay before and during the signing of the transaction documents do not constitute an overt manifestation of assent to be bound by the documents. Thus, the contribution agreement and the operating agreement are not enforceable. Further, because Campbell is not bound by the agreements' forum selection clauses and because Plaintiffs fail to identify any other applicable basis for personal jurisdiction, I dismiss the remainder of the claims for lack of personal jurisdiction.

## I.    PROCEDURAL HISTORY

Plaintiffs filed the original complaint in this case on March 17, 2015, and the First Amended Complaint—the operative complaint—on June 5, 2015 (the "Complaint"). Beginning on February 6, 2017, this Court held a five-day trial in this case. This Court issued its post-trial opinion on September 1, 2017.[1]

In that opinion, this Court outlined the standard for determining whether a valid contract exists, citing *Osborn ex rel. Osborn v. Kemp*.[2] That test requires that "(1) the parties intended that the contract would bind them, (2) the terms of the

---

[1]    *Eagle Force Hldgs., LLC v. Campbell* (*Trial Op.*), 2017 WL 3833210 (Del. Ch. Sept. 1, 2017).

[2]    *Id.* at *14.

contract are sufficiently definite, and (3) the parties exchange legal consideration."[3]

"To determine whether a contract was formed, the court must examine the parties' objective manifestation of assent, not their subjective understanding."[4] "If terms are left open or uncertain, this tends to demonstrate that an offer and acceptance did not occur."[5] "It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed."[6]

In determining whether the parties possessed the requisite intent that the transaction documents would bind them, this Court relied on *Leeds v. First Allied Connecticut Corp.* and evaluated the parties' objective manifestation of assent, focusing on "whether agreements reached were meant to address all of the terms that a reasonable negotiator should have understood that the other party intended to address as important."[7] "Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional

---

[3] *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[4] *Id.* (*Trexler v. Billingsley*, 166 A.3d 101, 2017 WL 2665059, at *3 (Del. June 21, 2017) (TABLE)).

[5] *Id.* (*Ramone v. Lang*, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006)).

[6] *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1101 (Del. Ch. 1986) (citing 1 *Corbin on Contracts* § 29, at 87-88 (1963); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir. 1984)).

[7] *Trial Op.*, 2017 WL 3833210, at *14 (quoting *Leeds*, 521 A.2d at 1102).

3

and tentative. Negotiation of complex, multi-faceted commercial transactions could hardly proceed in any other way."[8] To conduct such an analysis, courts review "all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations."[9] "Thus, determination of whether a binding contract was entered into . . . depend[ed] on the materiality of the outstanding issues in the draft agreement and the circumstances of the negotiations."[10]

Using the analytical framework of *Osborn* and *Leeds*, this Court held that the contribution agreement "[l]ack[ed] [t]erms that [w]ere [e]ssential to the [p]arties' [b]argain," and the parties, therefore, "did not intend to bind themselves to the written terms" in the contribution agreement.[11] This Court concluded that "the parties intended [the contribution agreement and the operating agreement] to operate as two halves of the same business transaction," and thus, the agreements "rise and

---

[8]  *Id.* (quoting *Leeds*, 521 A.2d at 1102).

[9]  *Id.* (quoting *Leeds*, 521 A.2d at 1102).

[10]  *Id.* (quoting *Greetham v. Sogima L-A Manager, LLC*, 2008 WL 4767722, at *15 (Del. Ch. Nov. 3, 2008)).

[11]  *Id.* at *14, *18.

4

fall together."[12] For that reason, this Court held that the parties did not intend to bind themselves to the written terms of the operating agreement.[13] As such, neither document was an enforceable contract.

Because the documents were not enforceable, the forum selection clauses in the documents subjecting Campbell to this Court's personal jurisdiction were not binding on Campbell.[14] This Court further held that Plaintiffs failed to identify any alternative basis for personal jurisdiction over Campbell.[15] Without the ability to exercise personal jurisdiction over the defendant, this Court dismissed the remaining claims in this matter.[16]

Plaintiffs appealed the decision.[17] On May 24, 2018, the Supreme Court reversed the decision and remanded with instructions and guidance.[18]

---

[12] *Id.* at \*18 (quoting *E.I. DuPont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985)).

[13] *Id.*

[14] *See id.*

[15] *See id.* at \*19.

[16] *See id.*

[17] Notice of Appeal, *Eagle Force Hldgs., LLC v. Campbell*, No. 399,2017 (Del. Sept. 28, 2017).

[18] *Eagle Force Hldgs., LLC v. Campbell* (*Supr. Ct. Op.*), 187 A.3d 1209 (Del. 2018).

First, the Supreme Court instructs that this Court make an express "finding on the parties' intent to be bound to each transaction document in accordance with the framework set forth in *Osborn* and guidance included" in its opinion.[19] In making these findings, this Court may consider only "evidence that the parties communicated to each other up until the time the contract was signed."[20] The evidence that may be considered includes "the parties' prior or contemporaneous agreements and negotiations."[21] The Supreme Court's guidance prohibits consideration of post-signing evidence.[22] Additionally, the Supreme Court instructs that "a signed writing ... generally offers the most powerful and persuasive evidence of the parties' intent to be bound."[23]

Second, the Supreme Court instructs that the parties' intent to be bound be considered separately for the contribution agreement and for the operating agreement.[24]

---

[19]     *Id.* at 1213.

[20]     *Id.* at 1229-30 (citing *Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).

[21]     *Id.* at 1230 (citing *Black Horse*, 2014 WL 5025926, at *12).

[22]     *See id.* at 1229-30, 1235 n.180.

[23]     *Id.* at 1230 (citing *Seiler v. Levitz Furniture Co. of E. Region*, 367 A.2d 999, 1005 (Del. 1976); *Osborn*, 991 A.2d at 1158-59).

[24]     *Id.* at 1238.

Consistent with that guidance, on remand, this Court considers whether the parties possessed the requisite intent to be bound by either the contribution agreement or the operating agreement. The evidence that may be considered is limited to the conduct of the parties during the period they negotiated the agreements and when they signed the agreements. This Court considers only that evidence that the parties communicated to each other up until the time the parties signed the documents. Any post-signing evidence included below serves only to prevent confusion for the reader. Also, because the Supreme Court's analysis suggests that both transaction documents address all terms material to the parties,[25] this Court does not examine the materiality of the terms of the agreements, or lack thereof.

## II. FACTUAL BACKGROUND

The facts in this opinion are my findings based on the parties' stipulations, 152 trial exhibits, including deposition transcripts, and the testimony of ten witnesses presented at a five-day trial before this Court that began on February 6, 2017.[26]

---

[25] *See id.* at 1231 ("Here, the Court of Chancery found that 'the precise consideration to be exchanged between Campbell and Eagle Force Holdings was highly material to the parties here.' The Contribution Agreement addresses the consideration to be exchanged. The only dispute is whether the terms relating to that consideration are sufficiently definite—a subject we address under the second prong of the *Osborn* test." (footnote omitted)); *id.* at 1239 ("The inclusion of provisions addressing these topics is strong evidence that the LLC Agreement included all material terms.").

[26] Citations to the trial transcript are in the form "Tr. # (X)" with "X" representing the surname of the speaker. Joint trial exhibits are cited as "JX #." Facts drawn from

7

## A. Parties and Relevant Non-Parties

### 1. Plaintiff EF Investments, LLC, and Richard Kay

Kay is a businessman and investor in the Washington, D.C., metropolitan area.[27] Since 2005, Kay has owned a government contracting company called Sentrillion with other partners.[28] Kay also controls Plaintiff EF Investments, LLC ("EF Investments"), a Delaware limited liability company.[29]

### 2. Plaintiff Eagle Force Holdings

Kay created Eagle Force Holdings, a Delaware limited liability company, to serve as the holding company for EagleForce subsidiaries.[30] The Amended and Restated Limited Liability Company Agreement of Eagle Force Holdings, LLC (the "LLC Agreement") contemplates that Campbell and EF Investments will each own fifty percent of the membership interests in Eagle Force Holdings.[31] The Contribution and Assignment Agreement (the "Contribution Agreement," together

---

the Joint Pretrial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to their post-remand briefs. After initially identifying individuals, I reference surnames without honorifics or regard to formal honorifics such as "Doctor." I intend no disrespect.

[27] Tr. 310:2-4, 354:22-355:2 (Kay).

[28] Tr. 18:8-23 (Offit).

[29] PTO ¶¶ 3-4.

[30] PTO ¶ 3; *see* JX 12 ¶ 2.

[31] *See* JX 79 § 3.2.1.

8

with the LLC Agreement, the "Transaction Documents") contemplates that EagleForce Associates and EagleForce Health will become subsidiaries of Eagle Force Holdings.[32]

### 3. Defendant Stanley Campbell

Campbell controls EagleForce Associates and EagleForce Health.[33] EagleForce Associates is a start-up company that Campbell intended to use to market a pharmaceutical software system called PADRE.[34] PADRE aggregates medical information about patients to assist in determining patients' prescriptions.[35] It also monitors pharmaceutical sales for compliance with federal law.[36]

### 4. Attorneys

Donald Rogers is an attorney from the Schulman Rogers law firm who represented Campbell through key parts of his negotiations with Kay.[37]

---

[32]    JX 78 Recitals.

[33]    *See* PTO ¶ 5.

[34]    Tr. 775:1-17 (Campbell).

[35]    Tr. 765:15-766:10 (Campbell).

[36]    *See* Tr. 766:16-20 (Campbell).

[37]    Tr. 817:3-4, 818:1-13 (Rogers).

Theodore Offit is an attorney from the law firm Offit Kurman who represented Kay in the negotiations with Campbell.[38]

### 5. Employees

Said Salah is the Vice President of Finance and CFO of EagleForce Associates.[39] From January 2016 until July 2017, he lived overseas and tapered off his services to EagleForce Associates.[40]

General John W. Morgan III is a Senior Vice President of EagleForce Associates and EagleForce Health.[41]

Christopher Cresswell is the head of Business Development of EagleForce Health.[42]

Katrina Powers is an employee of Sentrillion.[43]

---

[38]    Tr. 17:4-7, 20:11-12, 20:17-22 (Offit).

[39]    Tr. 1086:2-8 (Salah).

[40]    Tr. 1086:12-14 (Salah).

[41]    Tr. 1166:1-10 (Morgan).

[42]    JX 143, at 2; *see* Tr. 650:6-10 (Cresswell).

[43]    Tr. 246:24-247:2 (Powers).

## B. Facts

Campbell and Kay first met in 2005 or 2006 through a mutual friend when Campbell was seeking an investor for an earlier iteration of EagleForce Associates.[44] Kay did not invest in Campbell's business then.[45]

In January 2013, Campbell needed capital to market his PADRE technology through EagleForce Associates.[46] Before approaching Kay again, Campbell met Salah, who had experience with government contracting.[47] In April or May 2013, Campbell hired Salah to work with EagleForce Associates.[48] Salah also loaned money to EagleForce Associates and deferred collection of his salary to provide EagleForce Associates with cash needed for its operations.[49]

### 1. The November 2013 Letter Agreement

Despite Salah's investment, Campbell believed that EagleForce Associates needed additional capitalization from investors to obtain government contracts.[50]

---

[44]     Tr. 768:1-18 (Campbell).

[45]     Tr. 768:22-23 (Campbell).

[46]     *See* Tr. 775:1-6, 926:1-3 (Campbell); Tr. 1094:1 (Salah).

[47]     Tr. 1087:13-17, 1093:23-24 (Salah).

[48]     Tr. 1094:1-4 (Salah).

[49]     Tr. 926:1-3 (Campbell); Tr. 1091:17-22, 1094:19-1095:1 (Salah).

[50]     Tr. 774:14-24 (Campbell).

11

Campbell approached Kay again in or around November 2013 to discuss Kay's potential investment in EagleForce Associates.[51]

On November 27, 2013, Campbell and Kay signed a letter agreement dated November 15, 2013 (the "November 2013 Letter Agreement").[52] Kay's lawyers[53] at the law firm Offit Kurman drafted an initial version of the November 2013 Letter Agreement, but Campbell and Kay made changes to it before signing.[54] The November 2013 Letter Agreement contemplated that Campbell and Kay would "form a new LLC entity and/or a series of industry specific LLC's [sic] verticals in Virginia."[55] Campbell would contribute "PADRE source code and patents,"[56] and Kay would contribute at least $1.8 million in cash with the goal of raising $7.8 million in total financing from either Kay or a mutually agreed-upon investor.[57]

---

[51] Tr. 774:6-9, 775:1-3 (Campbell).

[52] JX 1.

[53] At the time the parties signed the November 2013 Letter Agreement, Campbell believed that Offit Kurman represented both Kay and Campbell. Tr. 783:21-784:6, 794:23-795:9 (Campbell). Offit Kurman, in fact, represented only Kay, and Campbell had no attorney representation. Tr. 18:8-11, 19:22-24 (Offit).

[54] Tr. 131:3-8 (Offit).

[55] JX 1 ¶ 2.

[56] *Id.* ¶ 7.

[57] *Id.* ¶ 6.

12

Under the November 2013 Letter Agreement, both Campbell and Kay would manage the new LLC and "confer on all business and marketing related activities as well as all capital needs."[58] All of the material terms of the November 2013 Letter Agreement were subject to due diligence.[59]

## 2. The April 2014 Letter Agreement

After executing the November 2013 Letter Agreement, Kay and Campbell continued to negotiate.[60] On March 17, 2014, Kay filed a certificate of formation for Eagle Force Holdings in Delaware.[61] Kay did not tell Campbell he had formed the Eagle Force Holdings entity; nor did he inform Campbell that he created a Delaware entity, rather than a Virginia entity.[62] On April 4, 2014, Kay and Campbell signed an amendment to the November 2013 Letter Agreement (the "April 2014 Letter Agreement"), which stated "[b]y April 21 it is anticipated that a new LLC will be formed to serve as a parent entity ('Holdco') for Eagle Force [sic] Associates, Inc. and the recently formed Eagle Force Health Solutions, LLC . . . ."[63]

---

[58]    *Id.* ¶ 4.

[59]    *Id.* ¶¶ 6, 8, 10.

[60]    *See* Tr. 322:14-18 (Kay); Tr. 795:10-23 (Campbell).

[61]    JX 7.

[62]    Tr. 991:3-993:24 (Campbell).

[63]    JX 12 ¶ 2.

Kay and Campbell signed the April 4, 2014 Letter Agreement without counsel present.[64] The April 2014 Letter Agreement "amend[ed] the letter agreement that [Campbell and Kay] executed on November 27, 2013 that was dated as of November 15, 2013."[65] The April 2014 Letter Agreement maintained that Campbell and Kay would share management responsibilities and confer regarding marketing and capital needs.[66] It also further defined Campbell's and Kay's roles in the anticipated parent company, referred to as "Holdco."[67] The April 2014 Letter Agreement stated that

> [Campbell] will have primary responsibility over all information technology, product development, R&D, and customer service and maintenance, in each case subject to an annual budget approved by the Holdco board. [Kay] will have primary responsibility over financial matters, personnel/HR, and management of outside accounting, legal, tax, and other advisors and consultants as well as all other matters relating to the operation of the business of

---

[64]   Tr. 380:10-11 (Kay). At the time Kay and Campbell signed the April 2014 Letter Agreement, Campbell believed that Offit Kurman represented both Kay and Campbell. Tr. 783:21-784:6, 794:23-795:9 (Campbell). Campbell did not hire his own attorney until later in April or May 2014. Tr. 796:4-11 (Campbell); Tr. 817:22-24 (Rogers).

[65]   JX 12, at 1.

[66]   *Id.* ¶ 4.

[67]   *See id.* ¶ 3.

14

> Holdco and its subsidiaries and will consult with [Campbell] on all decisions affecting these functions.[68]

The parties referred to the more defined spheres of management responsibility in the anticipated fifty-fifty business venture as "swim lanes."[69]

Recognizing that Kay and Campbell had not yet completed negotiations nor finalized the necessary documents reflecting their new business venture, the April 2014 Letter Agreement provided that Kay would advance $500,000 to Eagle Force Holdings immediately upon the execution of the April 2014 Letter Agreement.[70] And "[t]his $500,000 [would] be evidenced by a demand promissory note issued to [Kay] by Eagle Force [sic] Associates, Inc. and Eagle Force Health Solutions, LLC, jointly and severally . . . ."[71] The April 2014 Letter Agreement also contemplated that once Kay and Campbell finalized negotiations and completed the necessary transaction documents, Kay would contribute an additional $1,800,000 to equal the value of Campbell's intellectual property, $2,300,000.[72]

---

[68]     *Id.*

[69]     Tr. 319:11-14 (Kay).

[70]     JX 12 ¶ 6.

[71]     *Id.*

[72]     *See id.*

15

### 3. Negotiation of the LLC Agreement and the Contribution Agreement

After signing the April 2014 Letter Agreement, Kay continued due diligence on the EagleForce Associates business.[73] During this time, he provided funding to EagleForce Associates[74] and became involved in certain aspects of the day-to-day operations of the company.[75] Unfortunately, Kay's increased involvement in EagleForce Associates created tension and mistrust in Kay and Campbell's relationship, due in large part to their very different management styles and differing expectations of, involvement in, and control over the "swim lanes" identified in the April 2014 Letter Agreement.

As early as April 30, 2014, only two weeks after signing the April 2014 Letter Agreement, Kay expressed disappointment in Salah's contract-drafting skills and advised Campbell that Bryan Ackerman, Sentrillion's general counsel, would be involved in all contracts into which EagleForce Associates entered.[76] Campbell, however, valued Salah's contributions and experience and wanted Salah to have a

---

[73] *See, e.g.*, JX 39.

[74] JX 106.

[75] *E.g.*, Tr. 192:15-193:11 (Powers).

[76] JX 130, at 2.

greater role.[77]  Campbell responded to Kay, "I am no longer enjoying coming to work.  I do not think this will work.  Please tell me what I owe you and how we can move forward independently."[78]  Kay responded, referring to the November 2013 and April 2014 Letter Agreements, "I hope you had a tough day and don't really want to get into a [sic] issue.  My position is we are signed partners . . . ."[79]

Despite the fact that Kay and Campbell's relationship was becoming strained,[80] they began to negotiate the LLC Agreement for Eagle Force Holdings and the Contribution Agreement.[81]  In addition to Offit Kurman, Kay engaged Latham & Watkins to advise him on investing in the EagleForce Associates business.[82]  Campbell believed that Offit Kurman had been representing both Kay and Campbell together until Michael Schlesinger of Latham & Watkins advised Campbell that he

---

[77]    *See id.*; Tr. 797:7-16 (Campbell).

[78]    JX 130, at 1.

[79]    *Id.*

[80]    *See, e.g.*, *id.*

[81]    *See* JX 14; JX 15.

[82]    Tr. 32:16-24 (Offit).

17

should retain his own counsel.[83] In April or May 2014, Campbell retained his own attorney, Donald Rogers with the Schulman Rogers law firm.[84]

On May 13, 2014, Latham & Watkins presented a draft Contribution Agreement and a draft LLC Agreement for Eagle Force Holdings to Campbell.[85] Each agreement included a forum selection clause consenting to personal jurisdiction in the Delaware courts.[86] The LLC Agreement referred to the March 17, 2014 certificate of formation for Eagle Force Holdings in Delaware.[87] Campbell, thus, learned that Kay formed Eagle Force Holdings in Delaware at least by May 13, 2014.

Kay's involvement in the EagleForce businesses continued as Kay and Campbell negotiated the terms of the Transaction Documents. For example, in or about June 2014, Kay suggested that EagleForce Associates hire Melinda Walker as a secretary and pay her $75,000 per year.[88] This concerned Campbell because

---

[83] Tr. 783:21-784:6, 794:23-795:9 (Campbell).

[84] Tr. 796:4-11 (Campbell); Tr. 817:22-24 (Rogers).

[85] JX 14; JX 15.

[86] JX 14 § 8.9(b); JX 15 § 12.2.

[87] JX 15 Recitals.

[88] Tr. 436:16-22 (Kay); Tr. 735:2-4 (Variganti); Tr. 917:19-21, 918:12-18 (Campbell).

18

Walker's salary was higher than most EagleForce Associates employees' salaries at the time.[89]

On June 30, 2014, Rogers sent a revised draft of the LLC Agreement to Offit.[90] The draft included several notes indicating that certain points needed to be discussed and resolved, such as the distribution waterfall and the structure of Campbell's contribution of intellectual property.[91]

Also on June 30, 2014, Campbell received an email from Kay that Campbell believed contained a racial slur.[92] This email caused Campbell to have reservations about Kay's character, and from Campbell's perspective, his personal relationship with Kay continued to deteriorate. Despite Campbell's reservations, he continued to pursue a business relationship with Kay; EagleForce Associates continued to receive funding from Kay; and the parties continued to negotiate the Transaction Documents.

---

[89]    Tr. 919:6-10 (Campbell).

[90]    JX 17.

[91]    *E.g.*, JX 18 §§ 3.2.1, 5.1.2.

[92]    Tr. 1301:12 (Campbell); *see* JX 16. Kay maintains that the word was an error. Tr. 444:16-19 (Kay).

### 4. The July 7, 2014 meeting

On July 3, 2014, Offit sent Rogers an email confirming a meeting on July 7, 2014, at Rogers's office to negotiate the Transaction Documents.[93] Offit expressed his and Kay's concern that the negotiations were proceeding slowly, and Rogers responded that "[f]or the benefit of everyone, let's make Monday [July 7] the day we agree on all terms."[94]

On July 7, 2014, Kay, Campbell, and their respective counsel met at Rogers's office to negotiate the unsettled terms of the Contribution Agreement and the LLC Agreement.[95] Offit believed that three primary issues remained to be negotiated:[96] (1) the scope of the intellectual property that Campbell would contribute and the extent of Campbell's representation regarding his ownership of the intellectual property and any third-party infringement;[97] (2) the mechanics for dilution of Kay's

---

[93]    JX 24, at 1.

[94]    *Id.*

[95]    Tr. 61:8-23 (Offit).

[96]    Tr. 61:24-62:4 (Offit).

[97]    Tr. 62:4-18 (Offit).

and Campbell's interests upon additional third-party investments;[98] and (3) the structure of the Eagle Force Holdings board of directors.[99]

The July 7 meeting went late into the night, and the parties resolved the three issues that Offit understood to be outstanding.[100] But a substantial new issue arose. During that meeting, Offit discovered for the first time that Campbell had previously filed for bankruptcy.[101] This discovery led to another point of contention between Kay and Campbell.

On July 8, 2014, Offit sent Rogers a list of changes to the Contribution Agreement based on the July 7 discussion.[102] An associate at Rogers's firm sent a redlined draft of the LLC Agreement to Offit and Kay on July 9, 2014, incorporating the negotiated terms from the July 7 meeting.[103]

---

[98]  Tr. 62:19-63:6 (Offit); *see* JX 18 § 3.2.

[99]  Tr. 63:7-13 (Offit).

[100]  Tr. 63:16-66:9 (Offit). Also on July 7, Campbell signed an EagleForce Associates note payable to Kay for the $700,000 Kay had already contributed to EagleForce Associates. JX 34; JX 35. Kay and Campbell agreed that Kay would cancel the note if they were able to reach agreement on the Transaction Documents. JX 25, at 2.

[101]  Tr. 69:16-70:20 (Offit).

[102]  JX 28.

[103]  JX 29.

On July 9, 2014, an email was sent from Campbell's email address to Morgan announcing that EagleForce Associates and EagleForce Health had taken on Kay as their "first Partner."[104] Morgan responded, congratulating both Kay and Campbell and copying several EagleForce employees.[105] The same day, Campbell held a meeting at EagleForce Associates' office with all of the office staff to announce Kay's involvement in the business.[106] Kay suggested that Campbell's wife attend the meeting, and Campbell arranged for his wife to participate by phone.[107] Campbell also arranged for Kay's wife to participate by phone.[108] Kay did not appreciate Campbell's gesture and sternly told Kay, "Don't ever do that again. My wife is not involved in my business, and don't ever do that again."[109]

### 5. Tensions between Kay and EagleForce employees

As Kay and Campbell continued negotiations, Kay became more involved in the EagleForce business and interfaced more with EagleForce employees. Through

---

[104] JX 33. Campbell testified that he did not send this email but that Melinda Walker sent it from his email account without his permission. Tr. 941:3-942:3 (Campbell). Regardless, this email does not alter the weight of the evidence.

[105] JX 33.

[106] Tr. 1188:17-1189:8 (Morgan).

[107] Tr. 937:9-10 (Campbell).

[108] Tr. 937:10-12 (Campbell).

[109] Tr. 937:17-22 (Campbell).

these interactions, the employees experienced a more aggressive, erratic, and disrespectful Kay. And, unfortunately, Salah and Morgan observed that this mistreatment often ran along lines of national origin.[110] The recipients of a disproportionate amount of Kay's alleged mistreatment included Marlena Henien, a degreed Egyptian woman who did opportunity research at EagleForce Associates;[111] Jashuva Variganti, an Indian man who has an MBA degree and is an administrative employee of EagleForce Associates assisting with expense and payroll processing;[112] and Salah, an Egyptian man who has an MBA degree and is the CFO for EagleForce Associates.[113] Kay treated Henien like a servant, rather than a valued employee.[114] He would throw money down on her desk and instruct her to run personal errands and do tasks inappropriate for her role at EagleForce Associates.[115]

Kay yelled at Variganti, telling Variganti, "If I [Kay] ask you to do something, you should – you should do [it]."[116] In addition to this statement, Kay behaved in a

---

[110]    Tr. 1089:17-1090:3 (Salah); Tr. 1174:4-12 (Morgan).

[111]    Tr. 918:23-24, 932:3-10 (Campbell); Tr. 1090:18-21 (Salah).

[112]    Tr. 716:11-13, 717:9-14 (Variganti); Tr. 1090:9-16 (Salah).

[113]    Tr. 1085:17-18, 1086:2-8, 1140:19-21 (Salah).

[114]    *E.g.*, Tr. 931:18-932:1 (Campbell).

[115]    *Id.*

[116]    Tr. 720:3-6 (Variganti).

23

threatening manner. During one encounter, Kay stood an unusually short distance from Variganti while yelling at him.[117] Variganti testified that he felt threatened during this exchange with Kay.[118] Morgan observed Kay pinning Variganti against a cubicle partition.[119]

Kay treated Salah with the greatest deal of disdain. Kay condescended to Salah,[120] questioned to Salah's face why he was at EagleForce Associates,[121] questioned Salah's experience and competence,[122] and frequently yelled and cursed at him in front of Campbell.[123] Kay flatly said, "I just don't want him around."[124] Kay confessed to Morgan that he (Kay) "can't work with somebody like [Salah]. [H]e's an Arab."[125]

---

[117] Tr. 720:16-21 (Variganti).

[118] Tr. 720:22-721:5 (Variganti).

[119] Tr. 1175:6-20 (Morgan).

[120] Tr. 926:19-24 (Campbell).

[121] Tr. 1088:10 (Salah).

[122] *See* Tr. 927:21-928:6 (Campbell).

[123] Tr. 926:23-24 (Campbell); Tr. 1088:16-24 (Salah).

[124] Tr. 928:6-7 (Campbell).

[125] Tr. 1174:10-12 (Morgan).

Kay's behavior led to tensions in the office. Multiple employees voiced concerns about Kay's addition as a partner.[126] Morgan's concerns about Kay's behavior were so great that he (Morgan) told Campbell that he might quit if Campbell did not address Kay's behavior.[127]

Additionally, Kay did not limit his abuse to employees. He also became more aggressive toward Campbell. Kay shouted and cursed at Campbell within earshot of EagleForce employees during their disagreements.[128] Employees heard Kay yelling at Campbell even though the two men were in a closed conference room.[129]

Kay also began to speak negatively about Campbell to EagleForce employees. For example, Kay met with Cresswell at a country club in Potomac, Maryland, and told Cresswell that Campbell had a "shady past" and had previously committed fraud.[130]

Campbell grew more concerned but tried to see things from Kay's perspective, understanding that Kay had invested money in the venture.[131] Thus, he

---

[126]    *E.g.*, Tr. 921:13-20 (Campbell); Tr. 1174:16-18 (Morgan).

[127]    Tr. 1180:21-1181:6 (Morgan).

[128]    Tr. 722:9-15 (Variganti); Tr. 1089:7-16 (Salah); Tr. 1181:14-1182:9 (Morgan).

[129]    Tr. 1089:7-13 (Salah).

[130]    Tr. 656:4-657:23 (Cresswell).

[131]    Tr. 802:1-3 (Campbell).

25

continued to work toward the deal.[132]  But Kay's mistreatment of Campbell and EagleForce Associates employees strained Kay and Campbell's relationship.[133]

### 6.  Continued negotiations

Despite the building tension, Kay and Campbell continued to negotiate through July 2014.[134]  But on July 22, 2014, Kay sent an email to Campbell saying, "I am hearing that you may be trying to change the deal and we now may not be consistent understanding based on our agreemnt [sic]."[135]  Presumably, Kay was referring to the November 2013 and April 2014 Letter Agreements.

Near the end of July 2014, Kay and Campbell met without their lawyers to discuss open issues.[136]  On July 25, 2014, Campbell sent an email to Rogers, Offit, and Kay informing the lawyers of what Campbell and Kay had discussed.[137]  In part, Campbell wrote, "As for the Issue related to Bankruptcy—I don't think I have much

---

[132]  Tr. 802:8-10 (Campbell).

[133]  *See* Tr. 801:20-802:1 (Campbell).

[134]  *See, e.g.*, JX 31; JX 39; JX 41.

[135]  JX 43.

[136]  *See* JX 46.

[137]  *Id.*

of an issue . . . what we discussed and agreed is that we will pay any amount owed. I will change that to the point that we will pay any amount under $10,000."[138]

On August 5, 2014, Campbell, Kay, Rogers, and Offit met to attempt to agree on outstanding issues.[139] Campbell testified that Kay and Offit would not drop the bankruptcy issue[140] because they were concerned about Campbell's title to his intellectual property.[141] To indicate that Campbell was not willing to reopen his bankruptcy, he walked out of the meeting.[142] He testified, "[I] made it clear I wasn't doing that. And the only way I could make it any clearer was to leave."[143]

On or around August 6, 2014, both Kay and Campbell signed a handwritten sheet of paper that stated, "Campbell has rights to approve new investment."[144] Offit sent an email to Rogers to clarify what Kay meant in agreeing to the handwritten note.[145] He wrote, "[Campbell] told [Kay] he needed to be involved in all capital

---

138     *Id.*

139     Tr. 80:19-22, 81:22-82:4 (Offit).

140     Tr. 807:22-808:8 (Campbell).

141     Tr. 821:5-11 (Rogers).

142     *See* Tr. 808:9-24 (Campbell).

143     Tr. 808:20-22 (Campbell).

144     JX 54, at 4.

145     *Id.* at 1.

raise decisions. [Kay] is obviously in agreement on [Campbell's] need to be involved in capital raise matters, but [Campbell] cannot have a blocking right or veto right. The 3 person board needs to approve capital raise matters."[146]

On or before August 14, 2014, Kay and Campbell met and discussed thirteen open issues.[147] Kay handwrote[148] their agreed-upon conclusions on a sheet of paper that he scanned and sent to Campbell.[149] The list of thirteen points addressed topics Kay and Campbell had been negotiating, such as new equity capital and Campbell's compensation.[150] The list also addressed operational issues such as "[Campbell] & [Kay] will talk daily on big issues" and "[Kay] & [Campbell] agree we will push Chris Cresswell to close first 3 deals ASAP."[151]

On August 19, 2014, Rogers, Campbell's attorney, sent revised versions of the Transaction Documents.[152] The August 19 versions that Rogers circulated

---

[146]     *Id.*

[147]     Tr. 346:2-18 (Kay).

[148]     Tr. 345:16-22 (Kay).

[149]     JX 56.

[150]     *Id.* at 2.

[151]     *Id.*

[152]     JX 57.

backtracked on some of Campbell's concessions in the thirteen-point list.[153]

Rogers's August 19 draft, however, incorporated some of Kay's requests.[154]

On August 22, 2014, Campbell sent an email to Kay, Rogers, and Offit stating that on the bankruptcy issue, he and Kay were each willing to commit up to $5,000 to retain Campbell's personal bankruptcy lawyer and resolve the issue of his title to the intellectual property.[155] If that did not resolve the issue, Campbell agreed that out of the $500,000 distribution he would take at closing, he would "retain up to $250,000 in an attorney escrow of [his] choice for a period not to exceed 6 months."[156] Campbell was willing to set aside funds to pay any creditor claims, but he did not want to reopen a bankruptcy proceeding.[157]

On August 20, 2014, Campbell sent an email to Kay asking Kay to "refrain from any further disbursements to EagleForce until we have [an] executed agreement and established closing procedures."[158] In that same email, Campbell informed Kay that Campbell had been "seek[ing] other funding to meet the

---

[153]   *See, e.g.*, JX 59 § 4.1.8(a).

[154]   *See, e.g.*, JX 60 § 3.2(c).

[155]   JX 66.

[156]   *Id.*

[157]   Tr. 809:3-4, 810:5-10, 810:18 (Campbell).

[158]   JX 65, at 1.

29

commitments of the company."[159]  Kay refused to stop funding.[160]  When Kay refused to stop funding, Campbell responded by refusing to cash his own paychecks.[161]

On August 27, Offit sent another round of revisions to the LLC Agreement and the Contribution Agreement to Rogers, Kay, and Campbell with a cover email stating, "Please confirm your acceptance of the terms of these agreements.  Please commence preparation of schedules needed for closing."[162]  The date on the front of and in the first paragraph of the draft Contribution Agreement remained blank in the August 27 version.[163]  The missing date on the Contribution Agreement created an additional gap in the agreement because the closing date depended on the date of the agreement.[164]

---

[159]     *Id.*

[160]     *See* JX 106.

[161]     Tr. 948:21-949:16 (Campbell).

[162]     JX 68.

[163]     JX 71, at 1-2.

[164]     *Id.* § 3.1 ("[T]he closing of the Transactions (the 'Closing') shall be held at the office of the Company, commencing at 10:00 a.m. local time on the date hereof (the 'Closing Date') or at such other time and place as the Parties may agree upon in writing.").

The version of the Contribution Agreement that Offit sent with his August 27 email stated "OK [Offit Kurman] DRAFT 8-26-14" on the first page.[165] Although the last draft LLC Agreement had no such notation, the LLC Agreement was an exhibit to the Contribution Agreement.[166] Rogers was out of town when Offit sent the August 27 draft Transaction Documents,[167] and Offit received Rogers's automatic out-of-office reply.[168]

Campbell testified that once or twice through these weeks of negotiating the Transaction Documents, "Kay . . . [brought] a draft document to [Campbell] and ask[ed] [him] to sign it."[169] Although Campbell did not produce any of these signed drafts as evidence of this course of conduct,[170] Salah corroborates his testimony, noting that it is "not the normal practice to sign drafts. But Mr. Kay wanted these drafts to be signed as being received."[171] Campbell claims he is unable to produce

---

[165]    *Id.* at 1.

[166]    *See* JX 31 (without draft notation on cover page); JX 53 (same); JX 59 (same); JX 71 Ex. B; JX 73 (without draft notation on cover page).

[167]    Tr. 828:15-17 (Rogers).

[168]    JX 74.

[169]    Tr. 915:12-22 (Campbell).

[170]    Tr. 1277:2-8 (Campbell).

[171]    Tr. 1105:10-23 (Salah).

31

any signed drafts because they were stolen from his office, together with other documents.[172]

Throughout this entire period of negotiations, EagleForce Associates, still in its start-up phase, had limited sources of revenue[173] and relied on multiple funding sources to meet its financial obligations. Much of that funding came from Kay; between January 2014 and August 28, 2014, Kay contributed $841,213.[174] Others, including Salah and Kay's wife, invested in the EagleForce businesses or loaned them money.[175] Campbell also sought a loan from an investment banking company.[176]

### 7. The events of August 28, 2014

On August 28, 2014, Kay and Campbell met without their lawyers. Kay and Powers testified that Kay came to EagleForce Associates' offices with Powers to sign the Transaction Documents.[177] Campbell testified that he was unaware of Kay's

---

[172]   *See* Tr. 727:21-729:5 (Variganti); Tr. 923:8-924:21 (Campbell).

[173]   Tr. 323:19-24 (Kay).

[174]   *See* JX 106.

[175]   Tr. 775:6-11, 926:1-3, 952:23-953:9 (Campbell).

[176]   Tr. 953:12-17 (Campbell).

[177]   Tr. 287:8-19 (Powers); Tr. 329:7-11 (Kay).

purpose for the meeting.[178] Campbell was busy when they arrived but met with them briefly.[179] Because Campbell had to finish meeting with EagleForce developers, Kay and Powers left to go to a restaurant five minutes away.[180]

While Kay and Powers were at the restaurant, Kay and Campbell sent several emails to each other.[181] In the first email thread, Cresswell sent a non-disclosure agreement to Kay and Bryan Ackerman, Sentrillion's general counsel, copying Campbell.[182] Campbell replied, asking Cresswell not to "forward this information outside of the company until I have had a chance to review."[183] Kay responded, "What are you talking about outside the company? We just talk [sic] 3 minutes ago. I will handle my swim lane."[184] About ten minutes later, apparently without waiting for an answer from Campbell, Kay sent a second reply: "1). Bryan [Ackerman] is inside not outside 2). For the record I will handle all [NDA] contacts."[185] In

---

[178]    Tr. 973:10-974:5 (Campbell).

[179]    Tr. 329:18-330:3 (Kay).

[180]    Tr. 330:4-7 (Kay).

[181]    *See* Tr. 330:20-23 (Kay); JX 75; JX 76.

[182]    JX 75, at 2.

[183]    *Id.* at 1.

[184]    *Id.*

[185]    *Id.* at 3.

reference to earlier emails regarding the NDA, Campbell wrote to Kay, "As you can see I am not on the mail routing and this is a bit troubling. Only you can make these folks know that we are equal partners."[186] Kay replied, "Everyone knows we are equal . . . . Please clarify w[ith] chris [sic] and Bryan that [NDA] are in [business] lane and rick [sic] will handle. and [sic] send me the signed document if you want to go forward."[187]

Around the same time, Cresswell sent an email strategizing about how to "win" the Special Olympics as a client.[188] Kay replied to only Campbell, stating "Sorry cant [sic] do anything until the agreement documents you have are signed. Did you sign . . . ."[189] Kay sent his final email shortly before returning to Campbell's office.[190] In that email, which was not a reply to Campbell's email, but instead a follow up from his previous email, he wrote, "So what. This is getting really petty. . . . Have you send [sic] the signed doc?"[191]

---

[186]    JX 76, at 3.

[187]    *Id.*

[188]    *Id.* at 2.

[189]    *Id.*

[190]    *Compare id.*, *with* Tr. 237:9-12 (Powers).

[191]    JX 76, at 5.

At around 7:15 p.m., Kay and Powers returned to the EagleForce Associates offices.[192] Kay, Powers, and Campbell met for only a few minutes, and both Kay and Campbell signed the versions of the LLC Agreement and the Contribution Agreement that Offit had sent by email on August 27, 2014, without reading the documents.[193] Campbell testified that before the signing, Kay told him that Rogers and Offit "were done" with the agreements.[194] Campbell testified that he tried to call Rogers but was unable to reach him.[195] He testified that Kay tried to call Offit but was also not able to reach him.[196] Kay, in contrast, testified that he did not call Offit or make any representations about Campbell's lawyer.[197]

---

[192] Tr. 237:9-12 (Powers).

[193] Tr. 294:16-295:6 (Powers); Tr. 331:18-333:7 (Kay).

[194] Tr. 976:23-977:5 (Campbell).

[195] Tr. 977:14-21 (Campbell).

[196] Tr. 977:22-978:8 (Campbell).

[197] Tr. 334:7-10, 334:15-20 (Kay). Plaintiffs argue that Kay and Campbell had a past practice of signing legally binding agreements without counsel present, pointing to the November 2013 and April 2014 Letter Agreements. Pls.' Opening Br. 28. Kay and Campbell had signed the November 2013 and April 2014 Letter Agreements without their attorneys present, but the circumstances surrounding the signing of those documents differs significantly. First, Campbell believed that Kay and Campbell were represented together by the same attorney at the time he signed the Letter Agreements, but he learned later that the law firm represented only Kay and Campbell himself had been unrepresented. Tr. 33:15-22 (Offit); Tr. 794:23-795:9 (Campbell). Second, the Letter Agreements each served as a "roadmap to reaching a binding agreement." Pls.' Opening Post-Trial Br. 20. Third, unlike the August 28 Transaction Documents, months of negotiations did not precede the Letter Agreements. Fourth, the November 2013 and April 2014 Letter Agreements are

35

After Kay and Campbell signed the agreements, Campbell walked around his desk and embraced Kay and Powers.[198] The entire meeting lasted only two to five minutes.[199]

### 8. Events after the August 28 signing

Kay and Campbell never completed the closing on their agreement. On October 28, 2014, Kay, Campbell, Rogers, and Offit exchanged emails indicating Kay's and Campbell's different positions.[200] Kay emailed, "What else can we do together to get this done. I understand we have signed the deal but need the exhibits."[201] Campbell responded, stating in part, "The signatures on the drafts did not represent the completed document which remains not completed given the two

---

three and four pages in length respectively, which contrasts greatly with the dozens of pages that comprise the Transaction Documents. Fifth, Kay and Campbell carefully reviewed the terms of the Letter Agreements together and made joint revisions to the Letter Agreements before signing them; this process differs greatly from the brief August 28 meeting. *See* Tr. 131:5-7 (Offit). Sixth and finally, by the time they signed the August 28 Transaction Documents, Campbell and Kay's relationship had deteriorated, and they no longer trusted each other.

[198] Kay and Powers testified that Campbell hugged each of them after signing the Transaction Documents. Tr. 240:7-9 (Powers); Tr. 332:10-16 (Kay). Campbell testified that instead of a hug, he gave Kay a dap handshake. Tr. 987:24-988:10 (Campbell).

[199] Tr. 294:21-22 (Powers); Tr. 978:14-20 (Campbell).

[200] JX 93.

[201] *Id.* at 1.

---

or three remaining items."[202]   Over the following months, Kay and Campbell's relationship became more contentious.  Finally, on February 18, 2015, Campbell sent an email to Offit, Rogers, Kay, and Cresswell stating as follows:

> [W]e have reached an impass [sic] that we are unable to resolve.  I would respectfully request that the atty's [sic] get together to discuss the means and methods for us to close this matter and allow us to move on.  We have booked the funding as a loan and will proceed with amending the existing documentation in a means that is reasonable for us both.[203]

On March 17, 2015, Eagle Force Holdings and EF Investments filed this lawsuit to enforce the August 28 Contribution Agreement and LLC Agreement.[204]

## III.   ANALYSIS

Plaintiffs allege claims for breach of contract and breach of fiduciary duty.[205] Plaintiffs seek an order requiring Campbell to specifically perform his obligations under the Transaction Documents and granting monetary damages to Plaintiffs.[206] In the alternative, Plaintiffs assert claims for fraud and unjust enrichment.[207]

---

[202]   *Id.*

[203]   JX 103.

[204]   Compl. for Specific Performance, Declaratory and Injunctive Relief and Imposition of Constructive Trust.

[205]   Compl. ¶¶ 63-74.

[206]   Compl. ¶¶ 33-38, 74.

[207]   Compl. ¶¶ 45-49, 76-80.  Plaintiffs also assert that Campbell raises affirmative defenses of fraudulent inducement, duress, and mutual mistake in his post-trial

## A. Legal Standards

Plaintiffs have the burden of proving their claims by a preponderance of the evidence.[208] "Proof by a preponderance of the evidence means proof that something is more likely than not. 'By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose.'"[209]

To enforce either the Contribution Agreement or the LLC Agreement, Plaintiffs must prove that the respective document is a valid contract with Campbell.[210] It is settled Delaware law that "a valid contract exists when (1) the parties intended that the instrument would bind them, demonstrated at least in part

---

briefs; they, however, do not cite Campbell's post-trial briefs. Pls.' Opening Br. 28-33. Plaintiffs are correct as to the defenses of duress and mistake, but a careful review of Campbell's post-trial briefs reveals no reference to fraudulent inducement.

[208] *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015).

[209] *Id.* (footnote omitted) (citing *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)) (quoting *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *12 (Del. Ch. Oct. 14, 2015)).

[210] The parties raise the question of which jurisdiction's law applies to this case, but they do not brief the choice of law issue. The briefing relies heavily on Delaware law, and none of the parties asserts that the law of Delaware is in conflict with the law of any other jurisdiction whose law may apply. The Court, thus, will apply Delaware law to all issues this opinion addresses.

by its inclusion of all material terms; (2) these terms are sufficiently definite; and (3) the putative agreement is supported by legal consideration."[211]

The Supreme Court held that the terms of the Transaction Documents are sufficiently definite,[212] and the parties do not dispute whether the Transaction Documents are supported by legal consideration.[213] Thus, the question presented is whether the parties intended that the Transaction Documents would bind them.

> This question looks to the parties' intent as to the contract as a whole, rather than analyzing whether the parties possess the requisite intent to be bound to each particular term. "Under Delaware law, 'overt manifestation of assent—not subjective intent—controls the formation of a contract.'" As such, in applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions—including the putative contract itself. And, where the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound. However, Delaware courts have also said that, in resolving this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement.[214]

---

[211] *Supr. Ct. Op.*, 187 A.3d at 1229 (citing *Osborn*, 991 A.2d at 1158-59).

[212] *Id.* at 1238, 1240.

[213] *Id.*

[214] *Id.* at 1229-30 (footnotes omitted) (citing *Black Horse*, 2014 WL 5025926, at *12; *Seiler*, 367 A.2d at 1005; *Osborn*, 991 A.2d at 1158-59; *Del. Bay Surgical Servs.,*

## B. The Credibility of Kay and Campbell

The August 28 meeting plays a critical role in the question of formation. Kay and Campbell signed the Transaction Documents at issue during this meeting. However, no contemporaneous evidence exists, other than the Transaction Documents themselves, that reflects what happened at that meeting. Further, Kay's and Campbell's recollections of the August 28 meeting differ. As for the third attendee of the August 28 meeting, Powers, it appears that she was not present for or privy to all communications between Kay and Campbell.[215] Further, she does not recall the details of the conversations between Kay and Campbell during that meeting.[216] Thus, credibility assessments of Kay and Campbell tip the scales in this case. In my role as the trier of fact, I must assess the credibility of the witnesses, supported by the record.[217] My credibility determinations are based on the testimony and evidence submitted to make up the record.

---

*P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006)) (quoting *Black Horse*, 2014 WL 5025926, at *12). Although the Supreme Court has tasked me with determining the parties' intent to be bound, the Supreme Court appears to foreclose any analysis of material terms, as I held in my first opinion that there were missing material terms, which the Supreme Court reversed.

[215] *See* Tr. 291:16-292:13 (Powers).

[216] *Id.*

[217] *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1221 (Del. 2012) ("The law requires the trial judge to weigh the evidence, including the credibility of live witness testimony."); *Adams v. Jankouskas*, 452 A.2d 148, 151 (Del. 1982)

40

Kay challenges Campbell's credibility. Kay charges that Campbell's testimony given at deposition, multiple evidentiary hearings, and trial varies regarding (1) the manner in which the parties had signed documents in the past to acknowledge receipt, (2) the number of different drafts of the Transaction Documents that existed, and (3) Campbell's reliance on Kay's statements regarding the finality of the Transaction Documents.[218] First, Campbell's testimony varies regarding the method to acknowledge receipt of various drafts of the Transaction Documents. In his deposition testimony, he said that he generally initialed the cover page of the draft documents to acknowledge receipt but signed the August 28 Transaction Documents also to acknowledge receipt.[219] He also acknowledged that he was not consistent in initialing documents and sometimes used "some kind of indication" for his own tracking purposes.[220] In his trial testimony, he noted that he

---

("[W]here, as here, the trial court was faced with conflicting testimony, we accord great deference to the findings of the trial judge who heard all the witnesses.").

[218]  Oral Arg. Tr. 19:5-28:1 (Dec. 13, 2018); Pls.' Opening Br. 23-24.

[219]  JX 148, at 427:6-428:10.  Plaintiffs mischaracterize Campbell's deposition testimony when they state that Campbell testified that he "never signed his full name on the signature lines of the Transaction Documents to acknowledge receipt." Pls.' Reply Br. 11.  Campbell's deposition testimony indicates that he used various methods to acknowledge receipt.  JX 148, at 363:13-364:14.

[220]  JX 148, at 363:13-364:14.

41

"signed" various documents, including the August 28 Transaction Documents.[221]

Regardless, any inconsistency in Campbell's testimony pertains to the method to acknowledge receipt, not to the purpose of initialing or signing. Additionally, Campbell's deposition and trial testimony is consistent regarding the nature of the August 28 Transaction Documents.[222]

Second, Campbell testified at trial that he did not produce any previously signed (or initialed) drafts,[223] but he does not claim in his testimony that these drafts are different from and in addition to one of the drafts the parties introduced as exhibits at trial.[224] Third and finally, Campbell testified that Kay stated that the

---

[221] Tr. 915:12-916:22 (Campbell). A review of this testimony reveals that the examiner's questions and Campbell's answers focused on determining the number of endorsed drafts, not on the method of endorsement.

[222] To the extent a procedure for acknowledging receipt of draft documents existed, Kay and Campbell used that procedure only for their own discussions. Their attorneys did not require the parties to acknowledge receipt of documents by signing or initialing them. Tr. 862:16-19 (Rogers). Regarding this point, Plaintiffs again mischaracterize Campbell's testimony when they explain that "Campbell further acknowledged that his practice of initialing a document was not something that was required by Kay or Kay's counsel." Pls.' Reply Br. 11 (citing JX 148, at 367:4-10). The examiner asked, "[D]o you recall whether or not you were required *to send* that acknowledgement to either [Kay's counsel] or Mr. Kay or anyone else?" JX 148, at 367:4-7 (emphasis added). The examiner failed to ask whether Kay's counsel or Kay required Campbell to initial documents, the point for which Plaintiffs cite Campbell's deposition testimony.

[223] Tr. 1276:22-1277:22 (Campbell).

[224] *See* Tr. 915:12-916:22, 1274:23-1277:22 (Campbell). Plaintiffs claim that Campbell "was unable to produce any of these seven or more signed versions, which he now claimed were in addition to the eight versions listed in the Joint Stipulations." Pls.' Reply Br. 11-12 (citing Tr. 1276:22-1277:22 (Campbell)). This

attorneys had resolved all outstanding issues.[225]  But Campbell did not say that he relied on this statement to sign the agreements,[226] as Kay asserts.[227]  To the contrary, Campbell testified that he attempted to confirm the finality of the documents and when he could not, he signed to acknowledge receipt.[228]

I had multiple opportunities to observe Campbell and assess his credibility; he testified before me on three days of the five-day trial and at four evidentiary hearings.  His testimony as it relates to his intent to be bound by the Transaction Documents is credible.  He consistently testified that (1) he wanted confirmation from one of the attorneys that the documents were final, (2) when he could not get

---

claim mischaracterizes Campbell's testimony:  "My testimony is that I think I signed both of those documents on that time.  On a previous time, I think I signed three documents or four documents which were redlined.  On a previous time, I signed one document.  And I think the one -- the time that I signed the one document was the first one.  The time that I signed three was the second one; and the time that I signed two was the August one."  Tr. 1276:13-21 (Campbell).  This testimony from Campbell does not include any claim that any signed versions are in addition to the eight versions listed in the Joint Stipulations.

[225]   Tr. 976:2-4 (Campbell).

[226]   Tr. 976:2-16 (Campbell).

[227]   Pls.' Reply Br. 10.  Again, Plaintiffs mischaracterize Campbell's testimony and, in this instance, his arguments.  Plaintiffs challenge Campbell's credibility, stating that he "claims he signed the documents intending to be bound, but he did so in reliance on Kay's representation that the lawyers had signed off on the documents."  Pls.' Reply Br. 10 (citing Tr. 976:2-4 (Campbell)).  Campbell does not testify to this in the cited testimony, and Plaintiffs provide no other source for this claim.  *See* Tr. 976:2-977:24.

[228]   Tr. 1291:5-11 (Campbell).

this confirmation, Kay asked Campbell to sign to acknowledge receipt, and (3) the nature of the Transaction Documents suggested they were draft documents and it was okay to sign to acknowledge receipt. Documentary evidence suggesting the Transaction Documents appear on their face incomplete supports Campbell's testimony.

Further, Kay faces his own challenges regarding the veracity of his representations concerning the August 28 Transaction Documents. In particular, he manipulated the signed Contribution Agreement to convince others that the Transaction Documents were final. Cresswell testified that Kay showed him and Morgan the signed Contribution Agreement to make the point that Campbell and Kay had finalized their agreement.[229] But Cresswell also noted that the cover page of the document was torn.[230] Contemporaneous documentary evidence corroborates this testimony. An exhibit from Cresswell's deposition clearly shows the top-right corner missing from the first page where "OK DRAFT 8-26-14" had appeared, and text from the top-left corner of the second page is also missing.[231]

---

[229]  Tr. 661:14-662:2 (Cresswell).

[230]  Tr. 662:3-663:3 (Cresswell). Kay does not rebut or challenge Cresswell's testimony.

[231]  JX 114, at 1-2.

After listening to Campbell's testimony on multiple days, I find Campbell to be credible concerning the events of August 28 and place more weight on Campbell's testimony when it conflicts with Kay's and there is an absence of contemporaneous evidence.

## C. The Contribution Agreement

The parties present competing renditions of both the events leading up to the August 28 signing and the meeting where they signed the Transaction Documents. I summarize Plaintiffs' and Campbell's different stories for the reader.

### 1. Plaintiffs' story (as narrated by Kay)

Plaintiffs' strongest evidence of an intent to be bound is the signatures on the Transaction Documents. To bolster the evidence of the signatures, Plaintiffs also point to the relevant context leading up to the signing on August 28, 2014. From April 2014, when Campbell and Kay signed the April 2014 Letter Agreement, through August 28, 2014, Kay and Campbell continued the negotiation process.[232] Also during that time, Kay continued funding the business activities of EagleForce Associates.[233]

---

[232] *See* JX 14; JX 15; JX 19; JX 23; JX 31; JX 41; JX 52; JX 53; JX 58; JX 59.

[233] JX 106.

On July 7, 2014, Kay and Campbell met together with their attorneys.[234] During this extended meeting, they completed negotiations on three major issues.[235] Although another substantial issue arose during that meeting,[236] Kay and Campbell, with the assistance of their respective counsel, had worked through a majority of the open issues.[237] Two days later, an email was sent from Campbell's email address to Morgan announcing that EagleForce Associates and EagleForce Health had taken on Kay as their "first Partner."[238] Morgan responded, congratulating both Kay and Campbell and copying several EagleForce employees.[239] The same day, Campbell held a meeting at EagleForce Associates' office with all of the office staff to introduce Kay as a partner.[240]

As part of the negotiating process, on or about August 14, Campbell and Kay met together and hashed out some of the remaining issues.[241] They summarized their

---

[234]    Tr. 61:8-23 (Offit).

[235]    Tr. 63:16-66:9 (Offit).

[236]    Tr. 69:16-70:20 (Offit).

[237]    Tr. 63:22-66:9 (Offit).

[238]    JX 33.

[239]    *Id.*

[240]    Tr. 1188:17-1189:8 (Morgan).

[241]    Tr. 346:2-18 (Kay); JX 56.

discussion in a handwritten list containing thirteen points they had reached agreement on.[242]  Their attorneys used this list to continue revising the Transaction Documents.[243]  On August 25, Rogers said in his email to Kay, Offit, and Campbell that he believed they would be able to finalize the Contribution Agreement "within the next few days."[244]  Offit's email on August 27 reflected a similar feeling when he instructed the parties to "commence preparation of schedules needed for closing."[245]

On August 28, 2014, Kay and Powers went to the EagleForce Associates offices for the purpose of executing the Transaction Documents.[246]  Because Campbell could not meet with them immediately, they waited at a nearby restaurant.[247]  While they were at the restaurant, Campbell emailed Kay and referenced their business venture:  "Only you can make these folks know we are equal partners."[248]

---

[242]     Tr. 345:16-346:1 (Kay).

[243]     *See* JX 58; JX 59.

[244]     JX 67, at 1.

[245]     JX 68.

[246]     Tr. 287:8-19 (Powers); Tr. 329:7-11 (Kay).

[247]     Tr. 330:4-7 (Kay).

[248]     JX 76, at 3.

Kay's emails to Campbell made clear that Kay would take no action and contribute no funds until Campbell signed the Transaction Documents, literally stating, "[I] cant [sic] do anything until the agreement documents you have are signed."[249] At that time, EagleForce Associates was struggling financially. Still in its start-up phase, Associates had limited sources of revenue.[250] Rent for the EagleForce Associates offices was overdue for July and August, and September rent would soon be due.[251] Plaintiffs suggest that Campbell signed the Transaction Documents to secure Kay's continued funding of the EagleForce businesses.[252] Plaintiffs also state that Campbell failed to say or do anything that conveyed he lacked the intent to be bound by the signed Transaction Documents.[253] For example, Campbell failed to indicate orally or in writing that he signed the documents only to acknowledge receipt.[254] According to Plaintiffs, Kay and Campbell saw signing the documents as a next step in the partnership. The mood between them was happy.[255]

---

[249]    *Id.* at 2.

[250]    Tr. 323:19-24 (Kay).

[251]    Tr. 244:14-21 (Powers).

[252]    Pls.' Reply Br. 9.

[253]    Pls.' Opening Br. 22-23.

[254]    Tr. 238:11-14 (Powers); Tr. 334:21-335:1 (Kay).

[255]    Tr. 240:12-16 (Powers); Tr. 332:7-16 (Kay); Tr. 1296:9-1297:8 (Campbell).

48

## 2. Campbell's story

Although Campbell and Kay had been working toward finalizing the Contribution Agreement, several stumbling blocks to this process developed: (1) Kay and Campbell's relationship deteriorated, (2) employees complained about Kay, (3) each felt the other was reneging on the previous agreement, and (4) Campbell gave Kay multiple signs before August 28 that he (Campbell) wanted out of their agreement.

First, as Kay's involvement in EagleForce Associates business operations deepened, the relationship between Kay and Campbell deteriorated. Campbell was uncomfortable with some of Kay's business decisions. For example, in or about June 2014, Kay suggested that EagleForce Associates hire Melinda Walker as a secretary and pay her $75,000 per year,[256] a salary that concerned Campbell because it was higher than most EagleForce Associates employees' salaries.[257] Additionally, Kay sometimes acted aggressively toward Campbell and shouted and cursed at Campbell.[258] On June 30, 2014, Kay sent Campbell an email that included a word that Campbell interpreted as a racial slur.[259] On Campbell's part, he, at times,

---

[256]     Tr. 436:16-22 (Kay); Tr. 917:19-21, 918:12-18 (Campbell).

[257]     Tr. 919:6-10 (Campbell).

[258]     Tr. 722:9-15 (Variganti); Tr. 1089:7-16 (Salah); Tr. 1181:14-1182:9 (Morgan).

[259]     Tr. 1301:12 (Campbell); *see* JX 16.

49

avoided meeting Kay.[260]  This conduct, on the part of both Kay and Campbell, evidences the deterioration of their relationship and a growing mistrust between them.

Second, Kay mistreated multiple EagleForce employees, and some employees complained about Kay's behavior.  Kay directed his aggressive or demeaning behavior toward Variganti, Salah, and Henien.  Kay yelled at Variganti and pinned him against a cubicle wall.[261]  Kay condescended to multiple EagleForce Associates employees, sometimes treating them like errand runners, rather than valued employees in a business.[262]  Campbell, Salah, and Morgan observed that this mistreatment often ran along lines of national origin.[263]  Kay told Morgan that he (Kay) "can't work with somebody like [Salah]. [H]e's an Arab."[264]  Kay's behavior toward employees like Variganti, Salah, and Henien reflected this bias, and this behavior led to tensions in the office.  Multiple employees voiced their concerns

---

[260]  *See* Tr. 1171:20-24 (Morgan).

[261]  Tr. 720:3-6, 720:16-721:5 (Variganti); Tr. 1175:6-14 (Morgan).

[262]  *E.g.*, Tr. 931:18-932:1 (Campbell).

[263]  Tr. 927:15-932:16 (Campbell); Tr. 1089:17-1090:3 (Salah); Tr. 1174:4-12 (Morgan).

[264]  Tr. 1174:10-12 (Morgan).

50

about Kay's addition as a partner.[265] In a company as diverse as EagleForce Associates, a suggestion of racism would create problems at staff and management levels that Campbell could not ignore. In fact, Morgan's concerns about Kay's behavior were so great that he (Morgan) told Campbell that he might quit if Campbell did not address Kay's behavior.[266] Losing employees and their talent, especially in the start-up phase, would reduce EagleForce Associates' chances of success.

Third, Kay and Campbell both began to suspect that the other was not adhering to their original agreement. Campbell observed that Kay "kept moving the goalposts" in their agreement[267] and Kay reduced his original financial commitment to EagleForce.[268] Campbell testified that Kay unilaterally set up Eagle Force Holdings as a Delaware LLC without informing Campbell that he (Kay) was changing or ignoring a term of the November 2013 Letter Agreement.[269] Campbell also testified that Kay would threaten to turn off funding unless Campbell conceded something new, such as the structure of the board or Kay's control over another area

---

[265]    *E.g.*, Tr. 921:13-20 (Campbell); Tr. 1174:16-18 (Morgan).

[266]    Tr. 1180:21-1181:6 (Morgan).

[267]    Tr. 994:24-995:1 (Campbell).

[268]    Tr. 995:2-9 (Campbell).

[269]    Tr. 991:3-992:21 (Campbell).

of business operations.[270] Kay, on the other hand, stated explicitly in an email dated July 22, 2014, to Campbell that Campbell "may be trying to change the deal."[271] Kay felt the need to include other people, either attorneys or EagleForce employees like Cresswell and Morgan, in his meetings with Campbell.[272]

Fourth and finally, the mistrust and disagreements between Kay and Campbell reached a crescendo, causing Campbell to attempt to back out of the agreement. On August 20, 2014, only eight days before the parties would sign the Transaction Documents, Campbell sent an email to Kay asking Kay to "refrain from any further disbursements to EagleForce until we have [an] executed agreement and established closing procedures."[273] When Kay refused to stop funding, Campbell responded by refusing to cash his own paychecks.[274] Campbell's purpose for refusing his checks was twofold.[275] First, he wanted to make the point to Kay that they needed to resolve issues in their negotiations before continuing their business relationship.[276] Second,

---

[270]    Tr. 995:2-20 (Campbell).

[271]    JX 43.

[272]    Tr. 663:18-664:5 (Cresswell).

[273]    JX 65, at 1.

[274]    Tr. 948:21-949:16 (Campbell).

[275]    Tr. 950:6-8 (Campbell).

[276]    Tr. 950:11-18 (Campbell).

anticipating that EagleForce Associates would have to make payroll without any contribution from Kay, Campbell wanted to lower company expenses where he could.[277] Campbell had experienced difficulty making payroll and meeting the company's other financial obligations in the past. Campbell informed Kay that he (Campbell) was seeking other sources of funding and investment to replace Kay's contributions.[278] But even without additional funding, Campbell was prepared to continue the EagleForce Associates business. At several points in the company's history, Campbell obtained financial support from other sources, including Salah, Campbell's wife, and loans from financial institutions.[279] Campbell knew what it took to run the businesses with limited sources of revenue, and he was preparing to do it again.

Even during the evening of August 28, 2014, leading up to the signing, Kay and Campbell's conduct evidences their growing animosity for each other. At first, Campbell was not available to meet with Kay and Powers, and he asked Kay and Powers to wait in a conference room.[280] He asked them to wait while he completed

---

[277] Tr. 950:9-11 (Campbell).

[278] *See* JX 65, at 1.

[279] Tr. 775:6-11, 926:1-3, 952:23-953:9, 953:12-17 (Campbell).

[280] Tr. 234:11-15 (Powers).

53

a different meeting with developers.[281] Kay and Powers decided to wait at a nearby restaurant.[282] While they were waiting, Kay's tone in his emails to Campbell grew more aggressive. In just over an hour, Kay sent six emails to Campbell.[283] Two of those emails replied to the same email from Campbell.[284] Shortly before Kay and Powers returned to Campbell's office, Kay emailed Campbell, "So what. This is getting really petty. . . . Have you send [sic] the signed doc?"[285]

After Campbell had completed his meeting with developers, Kay and Powers returned to Campbell's office to sign the documents.[286] Before signing the Contribution Agreement, Campbell attempted to confirm Kay's assertion that the attorneys were done with the documents.[287] Campbell tried, unsuccessfully, to reach his attorney.[288] Campbell testified that, in the absence of his own attorney's confirmation, he asked Kay to confirm with Kay's attorney that the attorneys had

---

[281] *Id.*

[282] Tr. 330:4-7 (Kay).

[283] *See* JX 75; JX 76.

[284] *See* JX 76, at 3, 5.

[285] *Id.* at 5.

[286] Tr. 237:3-12 (Powers).

[287] Tr. 976:23-978:8 (Campbell).

[288] Tr. 977:14-21 (Campbell).

54

finalized the Transaction Documents.[289] Kay testified that he does not recall Campbell asking him to try calling his attorney.[290] In either case, Kay did not call his attorney.[291] Still without confirmation from either his or Kay's attorney, Campbell did not take the time to read the Transaction Documents before he signed them.[292] Then, during a meeting that lasted only two to five minutes,[293] Campbell signed the Transaction Documents.[294] Campbell testified that he signed the Transaction Documents at Kay's request to acknowledge receipt of the draft documents.[295]

Documentary evidence also suggests that the Contribution Agreement was not a final agreement. The most recent email from Offit makes it clear that Kay and Campbell still needed to approve the agreements and prepare the schedules to the Contribution Agreement.[296] Further, as Campbell testified, the state of the

---

[289]    Tr. 977:22-978:8 (Campbell).

[290]    Tr. 334:4-6 (Kay).

[291]    Tr. 334:7-10 (Kay).

[292]    *Compare* Tr. 976:15-16 (Campbell), *with* Tr. 239:10-14 (Powers).

[293]    Tr. 294:21-22 (Powers); Tr. 978:14-20 (Campbell).

[294]    Tr. 239:15-17 (Powers).

[295]    Tr. 976:17-22 (Campbell).

[296]    JX 68.

documents themselves do not suggest finality. Specifically, the first page of the Contribution Agreement is marked "DRAFT."[297] The Contribution Agreement also contained "many odd omissions involving important subjects."[298] "The Draft Contribution Agreement was unclear as to key issues, like the capitalization of the key operating subsidiaries, because key text that the agreement's terms called for, such as critical schedules, were absent."[299]

### 3. The reconciliation of the stories

Plaintiffs have the burden of establishing by a preponderance of the evidence that Campbell is bound by the Contribution Agreement.[300] "Proof by a preponderance of the evidence means proof that something is more likely than not. 'By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose.'"[301]

The Supreme Court discusses the evidence that the parties intended to be bound by the Contribution Agreement, noting that both parties' signatures provide

---

[297] JX 78, at 1; Tr. 977:11-12, 987:13-23 (Campbell).

[298] *Supr. Ct. Op.*, 187 A.3d at 1244 (Strine, C.J., dissenting).

[299] *Id.*

[300] *Revolution Retail*, 2015 WL 6611601, at *9.

[301] *Id.* (footnote omitted) (citing *Agilent Techs.*, 2010 WL 610725, at *13) (quoting *2009 Caiola Family Tr.*, 2015 WL 6007596, at *12).

"strong evidence that the parties intended to be bound by [the Contribution Agreement]."[302]

"[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound."[303]

> [P]rofessor Williston has stated that a signature "naturally indicates assent, at least in the absence of an invalidating cause such as fraud, duress, mutual mistake, or unconscionability. . . ." In *Osborn* itself, the signatures of both parties and the notarization of the written agreement provided enough evidence to show that the parties intended to be bound by it. Here, both parties signed the Contribution Agreement. That is strong evidence that the parties intended to be bound by it.[304]

"However, Delaware courts have also said that, in resolving this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements

---

[302]    *Supr. Ct. Op.*, 187 A.3d at 1231. The Supreme Court also highlights Campbell and Kay's embrace "after signing" as suggestive of the parties' reconciliation and the consummation of a deal. *Id.*

[303]    *Id.* at 1230 (citing *Seiler*, 367 A.2d at 1005; *Osborn*, 991 A.2d at 1158-59).

[304]    *Id.* at 1231 (omission in original) (footnotes omitted) (citing 2 Richard A. Lord & Samuel Williston, *Williston on Contracts* § 6:44 (4th ed.); *Osborn*, 991 A.2d at 1158-59).

and negotiations in evaluating whether the parties intended to be bound by the agreement."[305]

I recognize the strength of the evidence of a signature on an agreement. Signatures are often dispositive evidence of an intent to be bound. And in most instances, that evidence should carry the day. But in this highly unusual case, the signatures alone are not sufficient.[306] Here, the circumstances surrounding the execution of the Transaction Documents indicate that the signatures are not presumptive and certainly not conclusive. The record evidence reveals that Campbell's conduct and communications do not constitute an overt manifestation of his assent to be bound by the Contribution Agreement. First, trial testimony from Campbell and Salah evidence a practice of endorsing draft documents to acknowledge receipt, and this testimony weakens the presumption of an intent to be bound.[307] Campbell also credibly testified that, consistent with this practice, Kay

---

305    *Id.* at 1230 (footnote omitted) (citing *Del. Bay Surgical Servs.*, 900 A.2d at 650; *Black Horse*, 2014 WL 5025926, at *12).

306    17A Am. Jur. 2d *Contracts* § 173, Westlaw (database updated Aug. 2019) ("The fact that a party has signed a contract creates a strong presumption that the party has assented to the terms of the agreement."); *Carey's Home Constr., LLC v. Estate of Myers*, 2014 WL 1724835, *4 n.12 (Del. Super. Apr. 16, 2014) (citing 17A Am. Jur. 2d *Contracts* § 174 (2004), which correlates to § 173 in the 2016 update; *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 584 (3d Cir. 2009) (Under Pennsylvania law, "[s]ignatures are not dispositive evidence of contractual intent.").

307    Tr. 1104:6-1105:15 (Salah); Tr. 1276:13-21 (Campbell). In their Reply Brief, Plaintiffs claim that Salah did not answer the question asked by Campbell's counsel, "whether Kay told him that he (Kay) had 'asked Campbell to sign those drafts and

58

requested Campbell's signature to acknowledge receipt during the August 28 meeting.[308]

Second, the conduct and communications between Kay and Campbell before and during the signing appear inconsistent with what one would expect from two business partners finalizing a significant business deal. Leading up to the endorsement of the Transaction Documents, tensions rose between Kay and Campbell, disagreements increased (both in quantity and severity), and distrust between Kay and Campbell grew. Kay and Campbell both believed at times that the other was not honoring the original agreement or was trying to change the agreement. Campbell accused Kay of excluding Campbell from business decisions he should be included in[309] and bringing in outsiders without Campbell's approval.[310]

---

that Mr. Campbell did sign those drafts?'" Pls.' Reply Br. 12 (citing Tr. 1105:3-9 (Salah)). Plaintiffs cherry-picked this testimony and ignore the surrounding testimony. *See* Tr. 1104:6-1105:15 (Salah); *see, e.g.*, Tr. 1104:6-10 (Salah) ("Q. Now, before the end of August 2014, did Mr. Kay ever tell you that he brought any of these earlier drafts of the transaction documents to Mr. Campbell and asked Mr. Campbell to sign them? A. Yes.").

[308]    Tr. 976:17-22 (Campbell).

[309]    *See, e.g.*, Tr. 992:17:23 (Campbell).

[310]    JX 75, at 3.

To address these problems, Campbell required more and more safeguards to ensure that he was not losing control of the businesses.[311]

At the same time, Kay felt that Campbell's requests for safeguards were encroachments on Kay's "swim lane."[312] He accused Campbell of trying to change their deal.[313] Kay's assessment is understandable, especially when Campbell indicated that he sought other funding and wanted to delay the closing.[314]

Kay's and Campbell's problems with one another, however, were not the only issue. Campbell testified to disturbing instances of abuse, frequently directed at people of other national origins. Other non-party witnesses, both those who were the targets of abuse and those who personally saw their colleagues endure this abuse, corroborated this testimony. Salah testified credibly that Kay condescended to him, questioned Salah's purpose at EagleForce Associates, and was abrasive and vulgar toward Salah.[315] Variganti testified credibly that his interactions with Kay left him feeling threatened by Kay.[316] Morgan testified credibly that he witnessed Kay's

---

[311]    *E.g.*, JX 56, at 2 (evidencing that Campbell's veto on new investors was an issue).

[312]    JX 75, at 1.

[313]    JX 43.

[314]    *See* JX 65, at 1.

[315]    Tr. 1088:10-24 (Salah).

[316]    Tr. 720:3-721:5 (Variganti).

abuse of others and heard first-hand from Kay that he is biased against "Arabs."[317] These non-party witnesses stood to gain nothing from lying to this Court regarding this matter, and their very consistent testimony was highly credible. These employees reported these and other issues at the time, pressuring Campbell to reconsider a partnership with Kay.

Further, the tone of the August 28, 2014 meeting is inconsistent with Kay's story. When Kay and Powers arrived at the EagleForce Associates offices for the purpose of signing the Transaction Documents, Campbell did not greet them warmly or with an excitement associated with completing the deal. Instead, Campbell asked them to wait while he first met with his developers, even though the meeting with Kay would take only a few minutes.[318] He let Kay, the person who was about to become a fifty-percent partner in Campbell's business, sit and wait in a conference room.[319] After sitting in a conference room for well over an hour, Kay and Powers chose to continue to wait at a nearby restaurant.[320]

---

[317]    Tr. 1174:10-12, 1175:6-14 (Morgan).

[318]    Tr. 329:18-330:1 (Kay).

[319]    Tr. 234:11-15 (Powers).

[320]    Tr. 235:3-10 (Powers).

While they were waiting, Kay and Campbell exchanged emails.[321] These emails express anger, frustration, and disappointment from both Kay and Campbell. Kay was frustrated that Campbell was not respecting his swim lane.[322] Campbell expressed dissatisfaction that Kay excluded him from business activities and brought in outsiders without first informing Campbell.[323]

Finally, Kay and Powers returned to Campbell's office after 7:00 p.m., about two hours after they originally arrived.[324] Instead of an enthusiastic meeting to sign the Transaction Documents and move forward with the deal, Campbell dampened the mood with a request to confirm whether the lawyers had completed the documents.[325] This request seems reasonable in light of the draft notation on the first page of the Contribution Agreement.[326]

Neither Rogers nor Offit confirmed that the Transaction Documents were final.[327] The subject of the Contribution Agreement included the exchange of fifty

---

[321]    *See* JX 75; JX 76.

[322]    *See* JX 75, at 1.

[323]    *See id.* at 3; JX 76, at 5.

[324]    Tr. 237:9-12 (Powers).

[325]    Tr. 977:14-978:8 (Campbell).

[326]    JX 71, at 1.

[327]    Tr. 334:7-10, 334:15-20 (Kay); Tr. 977:14-978:8 (Campbell).

percent of Campbell's business for millions of dollars.[328]  For an exchange of this significance between parties who did not trust each other, a reasonable person would expect Campbell to wait to speak with his attorney or to read the documents more thoroughly before signing.  While the law does not require that Campbell do either of these things, under the unusual facts of this case, both acts are indicators of Campbell's intent to be bound (or a lack thereof).  Nonetheless, Kay and Campbell quickly signed the Transaction Documents, embraced, and left the meeting.[329]

It is unclear to me why Campbell signed the Transaction Documents rather than initialing them or waiting to sign them.  Maybe it is because the face of the Contribution Agreement did not reflect a final agreement.[330]  The Contribution Agreement contained "many odd omissions involving important subjects."[331] Dates were missing, schedules were still completely blank,[332] and key issues were

---

[328]    *See* JX 79 § 3.2.1.

[329]    Tr. 240:7-9 (Powers); Tr. 331:18-333:7 (Kay); Tr. 978:23-979:2 (Campbell).

[330]    *See* Tr. 987:13-23 (Campbell) ("Q. When you saw the word 'Draft' on the document that you signed on the 28th, did that mean anything to you?  A. Yes. That it was a draft.  Q. Did you understand draft to mean a final agreement?  A. Absolutely not. I understood it to be a draft. And then once we got to a final agreement, it would somehow be enumerated with 'Final' . . . .").

[331]    *Supr. Ct. Op.*, 187 A.3d at 1244 (Strine, C.J., dissenting).

[332]    JX 78, at 1-2; *id.* Scheds. 3.5, 4.1, 4.2(a).

unclear.[333] The Contribution Agreement, with its omissions, does not reflect a document a reasonable person expects to be a final version. Regardless, this meeting and the events leading up to it do not suggest to me that Campbell intended to be bound by the Contribution Agreement.

Kay highlights that Campbell had no other source of funding for the EagleForce businesses when Kay stopped contributing cash.[334] Kay's emails just before the meeting indicated that Kay was unwilling to help in any way until Campbell signed the Transaction Documents.[335] Kay suggests that Campbell finally capitulated to Kay to avoid financial difficulties and signed the Transaction Documents. The evidence, however, does not support this conclusion. First, Campbell had operated EagleForce Associates for years before Kay's involvement with limited sources of revenue.[336] He had been able to fund the company with loans or investment from others, such as Campbell's wife and Salah, during that time.[337] Second, Campbell had asked Kay to stop contributing funds days before signing,

---

[333] *Id.* § 3.2(c); *Supr. Ct. Op.*, 187 A.3d at 1244 (Strine, C.J., dissenting).

[334] *See* Pls.' Reply Br. 9.

[335] JX 76, at 3.

[336] *See* Tr. 775:10-11 (Campbell).

[337] Tr. 775:6-11, 926:1-3, 952:23-953:9 (Campbell).

and Campbell had started looking for other funding.[338] Third, Kay had contributed tens of thousands of dollars, against Campbell's clear instructions, as recently as August 21, 2014, only a week before signing the Transaction Documents.[339] It is unclear to me that Kay turning the screws between August 22 and August 28 really changed the EagleForce businesses' financial circumstances to such a degree that Campbell capitulated and signed the Transaction Documents that he believed were incomplete.

At best, Plaintiffs' counter-narrative presents evidence equal to that presented by Campbell. This balance is insufficient to prevail. Plaintiffs must prove that a contract exists by a preponderance of the evidence. Even including their strongest evidence, the signatures on the Transaction Documents, the evidence is at best in equipoise. And the evidence certainly does not meet the clear and convincing standard necessary for the relief Plaintiffs seek, specific performance.

### D. The LLC Agreement

To be an enforceable contract, the LLC Agreement must also meet the three elements of the *Osborn* test. Just as with the Contribution Agreement, I need address only whether the parties intended that the LLC Agreement would bind them.[340]

---

[338] JX 65, at 1.

[339] JX 106.

[340] *See Supr. Ct. Op.*, 187 A.3d at 1240.

In signing the November 2013 and April 2014 Letter Agreements, Kay and Campbell demonstrated their intent to create a limited liability company together. The LLC Agreement "amended and restated a preexisting agreement that stood on its own in the past and could do so in the future."[341] The August 27 version of the LLC Agreement was much more complete than the Contribution Agreement.[342] The parties have not argued that the LLC Agreement is missing material terms.[343]

Nonetheless, Kay and Campbell's negotiations and conduct leading up to the signing and at the signing also apply to the LLC Agreement. Kay and Campbell negotiated the LLC Agreement in tandem with the Contribution Agreement. Indeed, the LLC Agreement is an exhibit to the Contribution Agreement.[344] Rogers and Offit sent drafts of the LLC Agreement with drafts of the Contribution Agreement.[345] Campbell and Kay signed the LLC Agreement at the same meeting where they signed the Contribution Agreement.

Because the facts surrounding the negotiation and signing of the LLC Agreement are largely identical to those of the Contribution Agreement, the

---

[341]    *Id.* at 1239.

[342]    *Compare* JX 78, *with* JX 79.

[343]    *Supr. Ct. Op.*, 187 A.3d at 1240.

[344]    JX 78 Ex. B.

[345]    *E.g.*, JX 57.

conclusion I draw from Kay and Campbell's negotiations and conduct for the Contribution Agreement applies equally to the LLC Agreement. Nothing about the events leading up to or during the August 28 meeting suggests an intent to be bound by one document and not the other. Therefore, I conclude that Campbell did not intend to be bound by the LLC Agreement.

### E. Section 18-109 of the Delaware Limited Liability Company Act

The Supreme Court did not reach the question of whether Campbell is subject to jurisdiction by virtue of 6 *Del. C.* § 18-109(a).[346] Plaintiffs argued post-trial that this Court has personal jurisdiction over Campbell because (1) Campbell signed the April 2014 Letter Agreement that named him as a "member, President and Chairman" of the LLC and, thus, impliedly consented to personal jurisdiction under § 18-109(a)[347] and (2) Campbell actively participated in the management of a Delaware LLC, which also creates implied consent under § 18-109(a).[348] I held in the September 2017 Memorandum Opinion that because the April 2014 Letter Agreement concerns a Virginia LLC, Campbell did not consent to personal

---

[346] *Supr. Ct. Op.*, 187 A.3d at 1227 n.127.

[347] Pls.' Answering Post-Trial Br. 44-45.

[348] *Id.* at 45.

67

jurisdiction in Delaware by signing that agreement.[349]  Additionally, I held that

Campbell did not participate in the management of a Delaware LLC.[350]

Now, Plaintiffs argue only that § 18-109(a) applies to Campbell because

(1) he was aware by at least May 13, 2014, that Eagle Force Holdings was a

Delaware LLC by virtue of the LLC Agreement's reference to the March 17, 2014

certificate of formation for Eagle Force Holdings and (2) Campbell consented to this

Court's jurisdiction when he did not object to his appointment as a manager of an

existing Delaware LLC.[351]  Plaintiffs assert that § 18-109(a) applies regardless of the

enforceability of the Transaction Documents.[352]

Campbell responds that the language of §§ 18-109(a) and 18-101(10)[353]

requires Plaintiffs to show that Campbell materially participated in the management

---

[349]    *Trial Op.*, 2017 WL 3833210, at *19.

[350]    *Id.*  The Supreme Court did not reverse or otherwise disturb this holding.

[351]    Pls.' Opening Br. 54-55.  Plaintiffs waive their earlier argument regarding Campbell's participation in management of a Delaware LLC because they do not raise the issue in their post-remand briefs. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)) ("Issues not briefed are deemed waived.").

[352]    Pls.' Opening Br. 53.

[353]    The parties' briefs refer to 6 *Del. C.* § 18-101(10) for the definition of "Manager." Effective August 1, 2019, § 18-101(12) defines "Manager."  Del. S.B. 91, 150th Gen. Assem., 82 Del. Laws ch. 48 § 1 (2019).  The amended definition, however, does not apply retroactively.  This opinion, therefore, refers to subsection 10 and applies § 18-101(10) as it existed prior to the 2019 amendment. *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del. 1993) ("Delaware courts have

of the Delaware LLC or that "a limited liability company agreement or similar instrument under which the limited liability company is formed" names Campbell as a manager.[354] Campbell notes that the Supreme Court did not disturb the finding that Campbell did not materially participate in the management of a Delaware LLC, and he argues that there is no valid limited liability company agreement or similar instrument naming Campbell as a manager of a Delaware LLC.[355] Thus, according to Campbell, § 18-109(a) does not apply here.

Section 18-109 provides for the service of process on managers of Delaware limited liability companies. The relevant portion of § 18-109(a) states,

> A manager . . . of a limited liability company may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company . . . . [T]he term "manager" refers (i) to a person who is a manager as defined in § 18-101(10) of this title and (ii) to a person, whether or not a member of a limited liability company, who, although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company . . . .

---

recognized the general principle that statutes will not be retroactively applied unless there is a clear legislative intent to do so.").

[354] Def.'s Answering Br. 46 (citing 6 *Del. C.* § 18-101(10)).

[355] *Id.* at 46-47.

Section 18-101(10) provides the definition for "Manager": "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."

Plaintiffs' arguments regarding the application of § 18-109(a) do not persuade me to alter my September 2017 ruling because the first document indicating Eagle Force Holdings is a Delaware LLC is the unenforceable LLC Agreement. Plaintiffs argue post-remand that Campbell became a member and manager of Eagle Force Holdings by executing the April 2014 Letter Agreement and, thus, impliedly consented to personal jurisdiction in Delaware under § 18-109(a).[356] The April 2014 Letter Agreement did not inform Campbell that Kay had secretly created a Delaware limited liability company; nor did it mention anywhere the creation of a Delaware limited liability company.[357] To the contrary, it amended the November 2013 Letter Agreement, which mentioned a Virginia limited liability company.[358] When Campbell signed the April 2014 Letter Agreement, he was unaware that Kay had secretly created a Delaware LLC. The April 2014 Letter Agreement, thus, does not serve as implied consent to jurisdiction in Delaware.

---

[356]    Pls.' Opening Br. 54-55.

[357]    *See* JX 12.

[358]    *Id.* at 1; JX 1 ¶ 2.

Plaintiffs also argue that Campbell's failure to object to the provisions in the draft LLC Agreement after he learned of them warrants his implied ratification of those provisions.[359] This argument fails. "Agreements made along the way to a completed negotiation, even when reduced to writing, must necessarily be treated as provisional and tentative."[360] The parties here had not completed their negotiation, and therefore, the provisions of the LLC Agreement "must . . . be treated as provisional and tentative." A close reading of the April 2014 Letter Agreement supports this conclusion: "Until the [LLC Agreement] referred to herein is executed by the parties, [the April 2014 Letter Agreement] shall govern their conduct of business and the transactions and matters set out herein."[361] Without an enforceable LLC Agreement, the April 2014 Letter Agreement remains the operative agreement, and as I explain above, this letter agreement does not create Campbell's implied consent for this Court's personal jurisdiction. Thus, § 18-109(a) is not a source for this Court's personal jurisdiction over Campbell.

## IV. CONCLUSION

For the foregoing reasons, the Transaction Documents are not binding on Campbell. Plaintiffs, therefore, are not entitled to specific performance or damages

---

[359]    Pls.' Reply Br. 29.

[360]    *Leeds*, 521 A.2d at 1102.

[361]    JX 12 ¶ 18.

71

under the Transaction Documents, and Campbell is not subject to this Court's personal jurisdiction pursuant to the forum selection clauses in the Transaction Documents. Additionally, § 18-109 is inapplicable as a basis for personal jurisdiction. Plaintiffs identify no other basis for personal jurisdiction. Thus, I dismiss the remaining claims in this action. Defendant's motion to conform the pleadings to the evidence is denied as moot.

**IT IS SO ORDERED**.